AO 106 (Rev. 04/10) Application for a Search Warrant

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUN - 5 2017

CLERK, U.S. DISTRICT COURT
By _____
　　　　　　　Deputy

# UNITED STATES DISTRICT COURT

for the

Northern District of Texas

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. 4:17-MJ- **489** |
| Texas Bone and Joint Center | ) |
| 8251 Bedford-Euless Road, Suite 210 | ) FILED UNDER SEAL |
| North Richland Hills, Texas 76180 | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____Northern_____ District of _____Texas_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1347, 1349 | Healthcare Fraud; Conspiracy to Commit Healthcare Fraud |
| 18 U.S.C. § 371 | Conspiracy to Pay and Receive Illegal Kickbacks; |
| 42 U.S.C. § 1320a-7b(b) | Payment and Receipt of Illegal Kickbacks |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Adam Watson, USPS-OIG Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: June 5, 2017

_____
*Judge's signature*

City and state: Fort Worth, Texas

Jeffrey L. Cureton, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Adam Watson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      My name is Adam Watson ("Affiant"), and I am employed as a Special Agent with the United States Postal Service, Office of Inspector General ("USPS-OIG"). I have been a Special Agent with the USPS-OIG since May 2005. As a Special Agent with USPS-OIG, I am charged with investigating violations of the laws of the United States, collecting evidence in cases in which the United States is or may be a party in interest, and investigating crimes involving funding from the U.S. Postal Service. During my tenure as a Special Agent, I have been trained in the execution of search warrants for documents and other evidence in cases involving violations of federal law, including but not limited to: Title 18, United States Code, Sections 1347 (Health Care Fraud), 1349 (Conspiracy to Commit Health Care Fraud), 1956 (Money Laundering), 1957 (Money Laundering), and Title 42, United States Code, Section 1320a-7b(b) (Receipt or Payment of Kickbacks). I am currently assigned to the Houston Office, Southern Area Field Office of the USPS-OIG and am being assisted in the below-referenced investigation by the Department of Labor, Office of Inspector General ("DOL-OIG"), Department of Veterans Affairs Office of Inspector General ("VA-OIG"), and Defense Criminal Investigative Service ("DCIS").

## A. NATURE OF THE INVESTIGATION INTO FRAUDULENT COMPOUNDED PHARMACEUTICALS

2.      The investigation focuses on allegations of a conspiracy involving the below-referenced individuals, through the below-referenced entities, to defraud government programs through billings for compounded pharmaceuticals or medicines ("Compounded Drugs") for

patients where those Compounded Drugs are not medically necessary or not prescribed legitimately.

3.      By way of background, the practice of compounding – producing Compounded Drugs – is a practice whereby a licensed pharmacist, a licensed physician or an outsourcing facility under the supervision of a licensed practitioner combines, mixes or alters ingredients of a drug or multiple drugs to create a drug, tailored to meet the medical needs of a specific patient.

4.      Compounded Drugs are not approved by the United States Food and Drug Administration ("FDA"). In other words, the FDA does not verify the safety, potency, effectiveness or manufacturing quality of Compounded Drugs.

5.      The Texas State Board of Pharmacy regulates the practice of compounding in the State of Texas.

6.      Compounded Drugs may be prescribed by a physician when an FDA-approved drug does not meet the medical needs of a particular patient. A patient may, for example, have a specific condition that would be generally treated by an FDA-approved drug but such a drug may not be appropriate for the patient because he or she may be allergic to a specific ingredient, such as a dye or preservative, in that drug. In that scenario, the patient may receive a prescription from a physician for a specific Compounded Drug that excludes whatever ingredient or aspect that prevents that patient from otherwise using the FDA-approved drug. A patient may also, for example, be unable to take an FDA-approved drug for a medical condition because he or she cannot consume the drug by traditional means, such as swallowing. In that scenario, the patient may again receive a prescription from a physician for a Compounded Drug that allows the patient to take a medicine in another form, perhaps liquid or powder, so that he or she may consume it.

Attachment A –Solo Page

## B. PURPOSE OF THE AFFIDAVIT

7.      This affidavit is made in support of an application for a warrant to search the following location:  Texas Bone and Joint Center ("TXBJ"), a medical clinic located at 8251 Bedford-Euless Road, Suite 210, North Richland Hills, Texas 76180 ("SUBJECT PREMISES"). The SUBJECT PREMISES is more specifically described in Attachment A, attached hereto and incorporated as if fully set forth within.

## C. THE DEFRAUDED HEALTHCARE BENEFIT PROGRAMS

a.   The Federal Employee's Compensation Act

8.      Title 18, United States Code, Section 24(b) defines a health care benefit program as any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual and included any individual or entity who provided a medical benefit, item or service for which payment may be made under the plan or contract.

9.      The Federal Employee's Compensation Act ("FECA") is a health care benefit program as defined in Title 18, U.S.C. Section 24(b).

10.      FECA is a "Federal health care program" as defined by 42 U.S.C. § 1320 a-7b, that affects commerce, and as the term is used in 18 U.S.C. § 1320 a-7b(b).

11.      FECA provides for payment of workers' compensation benefits to federal employees who suffer an injury, disease or death in the performance of duty.  To establish a claim for benefits, a medical condition is required to be causally related to a claimed injury, disease or death.  Benefits are only available while a work-related condition continued.  The benefits under FECA include continuation of pay ("COP") for up to 45 calendar days, compensation for lost wages, all necessary medical care, medical supplies and prescription drugs, vocation rehabilitation services, and disability payments.  FECA provides coverage for

Attachment A –Solo Page

pharmaceuticals necessary to treat symptoms which are the result of a work-related injury if prescribed by a doctor and medically necessary.

12.     The Department of Labor ("DOL") Office of Workers' Compensation Program ("OWCP") administers the benefits under FECA.  Providers of health care services are required to enroll with DOL-OWCP to receive a provider identification number and reimbursement under FECA.  Form OWCP-1168 is used for enrollment and updating provider information.  By completing and submitting Form OWCP-1168, a provider certifies that all the federal and state licensure and regulatory requirements applicable to their provider type are satisfied.

13.     DOL-OWCP contracts with Affiliated Computer Services ("ACS") to provide medical claims processing and payments.  ACS serves as the billing administrator for FECA.  In this capacity, ACS receives provider enrollment forms from prospective FECA providers, assigns provider numbers, and processes and pays claims for benefits under FECA.

14.     All providers are required to enroll with DOL-OWCP through ACS. After the assignment of a provider number, the provider is given access to the ACS online system, by which the provider may submit bills, check the status of pending claims, and perform other billing related functions. The provider may submit bills using either the ACS provider number or the provider's Social Security number.

15.     Providers are required to identify on each claim the services provided.  All claims submitted are required to be supported by medical evidence.  The submission of a claim and acceptance of payment by a provider signifies that the service for which reimbursement was sought, was performed as described, medically necessary and appropriate, and properly billed in accordance with accepted industry standards.  It is not within industry standards, among other

things, to charge for services that are not medically necessary, not legitimately prescribed or both.

16.     Payments are sent to providers via electronic funds transfer ("EFT"). Remittance notices listing all the claims paid on each EFT are sent to providers. Remittance notices that list all the claims paid on each EFT are sent to providers. Payments are tracked by DOL-OWCP through a Transaction Control Number ("TCN").

## D.  THE RELEVANT ENTITIES AND INDIVIDUALS

### a.  Compounding Solutions LLC

17.     Compounding Solutions LLC ("Compounding Solutions") is a pharmacy involved in the compounding of Compounded Drugs located at 11240 FM 1960 West, Suite 404, Houston, Texas 77065. Compounding Solutions is enrolled with DOL-OWCP.

18.     Nirvana Hightower ("HIGHTOWER"), according to records of the Texas Secretary of State, is an Officer of Compounding Solutions. HIGHTOWER, according to records of the Texas State Board of Pharmacy, is also the Pharmacist-in-Charge of Compounding Solutions.

19.     HIGHTOWER, according to bank records returned in this investigation, is an authorized signatory for a bank account of Compounding Solutions, doing business as Healthquest Pharmacy.

20.     Kenny Ozoude ("OZOUDE"), according to the same bank records, is also an authorized signatory with HIGHTOWER on the bank account of Compounding Solutions.

21.     From on or about October 1, 2014 and on or about April 30, 2017, Compounding Solutions billed DOL-OWCP approximately $51,854,472.00 for Compounded Drugs and other medicines. DOL-OWCP paid approximately $21,362,040.00 on those claims.

**Attachment A –Solo Page**

22.     Payments from DOL-OWCP on Compounding Solutions' approved claims for Compounded Drugs and other medicines, as described below, are deposited in the bank account of Eudora Healthcare Consulting LLC.

     b.   Eudora Healthcare Consulting LLC

23.     Eudora Healthcare Consulting LLC ("Eudora") is a Texas-incorporated limited liability corporation, located at 4141 Southwest Freeway, Suite 390, Houston, Texas 77027.

24.     OZOUDE, according to records of the Texas Secretary of State, is the President of Eudora.  OZOUDE, according to bank records returned in this investigation, is also listed both as the President of Eudora and as the authorized signatory for Eudora's bank accounts.

25.     Eudora is recorded as the "Depositor Account Title" on the Department of Treasury Standard Form (SF) 3881,[1] a form submitted on behalf of Compounding Solutions to DOL-OWCP for Compounding Solutions to be reimbursed for its approved claims to DOL-OWCP.  Compounding Solutions electronically submits claims through the ACS online system using its assigned provider number.

26.     DOL-OWCP electronically deposits payments for Compounding Solutions' approved claims for Compounded Drugs and other medicines into Eudora's bank account. According to bank records returned in this investigation, from on or about October 16, 2014 to on or about November 25, 2016, DOL-OWCP electronically paid approximately $17,133,799.66

---

[1] A Federal agency initiates a SF 3881 form to enroll its vendors to receive payment by electronic funds transfer. In the Financial Institution Information Section of the SF 3881, the financial institution prints or types the name and address of the payee/company's financial institution who will receive the Automated Clearing House (ACH) payment, ACH coordinator name and telephone number, nine-digit routing transit number, depositor (payee/company) account title and account number. Also, the box for type of account is checked, and the signature, title, and telephone number of the appropriate financial institution official are included.
**Attachment A –Solo Page**

to the bank account of Eudora for Compounding Solutions' approved claims for Compounded Drugs and other medicines.

      c.   TXBJ

27.     Dr. Deepak Chavda ("DR. CHAVDA"), according to records of the Texas Medical Board, is a physician licensed in the State of Texas. DR. CHAVDA, according to these same records, has a primary specialty of orthopedic surgery and a primary practice located at the SUBJECT PREMISES. DR. CHAVDA, according to records of the Texas Secretary of State, is listed as the President, Vice President, Secretary and Treasurer of TXBJ. TXBJ is enrolled in the DOL-OWCP program.

28.     Between on or about April 7, 2016 to on or about February 9, 2017, DR. CHAVDA, according to billing records of the U.S. Postal Service, sent prescriptions to Compounding Solutions for Compounded drugs and other medications for approximately 28 Postal Service patients. DOL-OWCP paid approximately $4,459,254.00 on those claims.

      d.   Naresh Jivanji

29.     Naresh Jivanji ("JIVANJI"), according to records of the Texas Secretary of State, is the Authorized Person of Medcare Advisory, LLC ("Medcare"). JIVANJI, according to bank records returned in this investigation, is also the authorized signatory for Medcare. Medcare, according to records of the Texas Secretary of State, is located at 905 Harwood Court, Euless, Texas 76039. JIVANJI, according to Tarrant County Appraisal District, is an owner of 905 Harwood Court, Euless, Texas.

30.     Between on or about April 9, 2016 and on or about December 19, 2016, Eudora transferred approximately $3,269,588.04 to Medcare through a bank account for which JIVANJI is the authorized signatory.

Attachment A –Solo Page

31.    Between on or about April 7, 2016 and June 30, 2016, JIVANJI through Medcare transferred approximately $12,535.00 to TXBJ.

32.    Between on or about May 15, 2016 and November 30, 2016, JIVANJI transferred approximately $1,100,000.00 to TXBJ through a bank account for which DR. CHAVDA is the authorized signatory.

33.    Affiant believes based on his experience and prior investigations that the payments between these individuals and entities are likely kickbacks for the prescription of Compounded Drugs and other medicines DR. CHAVDA sent to Compounding Solutions.

## E.  PROBABLE CAUSE OF VIOLATIONS OF FEDERAL LAW

34.    Affiant believes, and has summarized key facts herein to support this belief, that probable cause exists that the individuals referenced herein, and others, have fraudulently induced FECA to pay claims submitted by Compounding Solutions for Compounded Drugs and other medicines that are medically unnecessary, not legitimately prescribed or both.  Affiant believes that probable cause exists that these same individuals, and others, have committed the following offenses, among others:  conspiracy to commit healthcare fraud under 18 U.S.C. § 1349; healthcare fraud under 18 U.S.C. § 1347; conspiracy to pay and receive illegal kickbacks under 18 U.S.C. § 371; and the payment and receipt of illegal kickbacks under 42 U.S.C. § 1320a-7b(b).

35.    The statements in this affidavit are based on information I learned during the investigation, information provided to me by other agents, public sources, business records, and my experience and background as a Special Agent.

36.    Since this affidavit is being submitted for the limited purpose of obtaining a search warrant, I have not included each and every fact known to me concerning this

investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of crimes, fruits of crime, contraband, and other items illegally possessed, in violation of the above-referenced federal laws, among other offenses, are currently located at the SUBJECT PREMISES.

37.     Affiant believes that probable cause exists to believe individuals referenced herein, among others, have also conspired to defraud DOL-OWCP through fraudulent claims by Compounding Solutions for Compounded Drugs and other medicines prescribed by DR. CHAVDA through the following manner and means, among others: (1) DR. CHAVDA prescribes an injured federal employee a Compounded Drug that is not medically necessary; (4) DR. CHAVDA sends the prescription for the Compounded Drug to be filled at Compounding Solutions; (4) Compounding Solutions bills DOL-OWCP for the Compounded Drug; (4) DOL-OWCP approves the claim and deposits the payment in the operating account of Eudora; (5) the proceeds of those payments are then distributed in the form of kickbacks first to JIVANJI through Medcare; and (6) JIVANJI then transfers a portion of those proceeds in the form of kickbacks to DR. CHAVDA.

        i.   Interviews

            1.   Statements of C.W., a DOL-OWCP claimant

38.     On January 18, 2017, agents interviewed DOL-OWCP claimant C.W., an employee of the U.S. Postal Service. C.W. stated that DR. CHAVDA has treated C.W. for a knee injury that C.W. sustained on the job in or around 2007.

39.     C.W. stated that approximately a few years ago C.W. started receiving compounded pain creams prescribed by DR. CHAVDA. These creams, according to C.W., were

mailed to C.W. by Compounding Solutions. C.W. recalled also receiving Celebrex, which C.W. noted is delivered when C.W. needs it.

40.     C.W. explained that C.W. received too much of the pain creams and had to contact DR. CHAVDA to tell him C.W. already had plenty of the creams.

41.     From in or around April 2016 to in or around March 2017, Compounding Solutions billed DOL-OWCP approximately $756,157.28 for compounded pain creams and other medicines prescribed by DR. CHAVDA on behalf of C.W.  DOL-OWCP paid Compounding Solutions approximately $249,398.68 on those claims.

2.   Statements of K.C., a DOL-OWCP claimant

42.     On January 18, 2017, agents interviewed DOL-OWCP Claimant K.C., an employee of the U.S. Postal Service.

43.     K.C. stated that DR. CHAVDA treated K.C. for a knee injury since in or around 2002. K.C. stated that in or around November 2016 K.C. started receiving compounded pain creams and vitamins prescribed by DR. CHAVDA and mailed from Compounding Solutions. K.C. recalled specifically receiving metabolic supplements and Resveratrol from Compounding Solutions. K.C. further stated that DR. CHAVDA initially prescribed Tramadol for K.C.'s pain and later prescribed Celebrex for the same. DR. CHAVDA, according to K.C., told K.C. he wanted to try these creams in lieu of surgery.

44.     K.C. recalled receiving two bottles of cream and two bottles of pills in the first mailing container from Compounding Solutions. K.C. explained that within the box was a form K.C. was required to complete and mail back to Compounding Solutions, indicating that K.C. received the medicine. K.C. stated that once K.C. returned this form another two tubes of pain cream and two bottles of pills would arrive again. Compounding Solutions, according to K.C.,

was sending too much medicine and it was arriving too soon.  K.C. recalled speaking with

DR. CHAVDA about the medicines and thereafter the mailings came less frequently.  K.C.

stated K.C. currently has four tubes of pain creams that K.C. does not use.  K.C. stated that K.C.

was unaware of the cost of these creams and vitamins.

45.     From in or around June 2016 to in or around March 2017, Compounding

Solutions billed DOL-OWCP approximately $277,531.76 for compounded pain creams and other

medicines prescribed by DR. CHAVDA on behalf of K.C.  DOL-OWCP paid Compounding

Solutions approximately $141,983.34 on those claims.

3.   Statements of K.F., a DOL-OWCP claimant

46.     On January 18, 2017, agents interviewed DOL-OWCP claimant K.F., an

employee of the U.S. Postal Service.

47.     K.F. told agents DR. CHAVDA has treated K.F.'s knee injury since in or around

January 2015.  K.F. explained how in or around 2016 K.F. started receiving compounded

medicines from Compounding Solutions, specifically pain creams, metabolic vitamins, and

Tramadol for pain.

48.     K.F. recalled telling DR. CHAVDA the pain creams that K.F. received were not

effective.  DR. CHAVDA, according to K.F., told K.F. he would change the prescription to a

stronger dosage.  K.F. stated that K.F. continued receiving the pain creams on a monthly basis

but did not believe the "stronger" creams were effective.  K.F. recalled frequently sending the

creams back to the pharmacy.  K.F. stated that in or around 2015 or 2016 K.F. contacted the

pharmacy about cancelling these creams.  An unknown individual at the pharmacy, according to

K.F., told K.F. to contact DR. CHAVDA to cancel, which K.F. did.

49.      K.F. told agents that K.F. currently has four or five bottles of cream that K.F. was not using. K.F. further stated that an unknown individual from Compounding Solutions called to see if K.F. needed refills of the creams and to inquire why K.F. requested a cancellation of the creams. K.F. stated K.F. continues to receive monthly shipments of the creams.

50.      K.F. recalled also receiving metabolic vitamins which were supposed to be for K.F.'s immune system and to control K.F.'s weight. K.F. stated DR. CHAVDA did not make K.F. aware these vitamins were prescribed for K.F. These vitamins, according to K.F., burned K.F.'s throat and led K.F. to tell DR. CHAVDA to stop the shipments. K.F. recalled still receiving these vitamins after K.F. requested the shipments be stopped.

51.      From in or around April 2016 to in or around March 2017, Compounding Solutions billed DOL-OWCP approximately $513,238.28 for compounded pain creams and other medications prescribed by DR. CHAVDA on behalf of K.F. DOL-OWCP reimbursed Compounding Solutions approximately $216,669.63 on those claims.

    i.  Suspect Bank Transactions

52.      The following describes how the above-referenced individuals, according to bank records returned in this investigation, distribute in the form of suspected kickbacks the payments from DOL-OWCP to Compounding Solutions for Compounded Drugs and other medicines. These payments are deposited in the account of Eudora; transferred in part to Medcare, an entity affiliated with JIVANJI; and transferred in part to TXBJ, an entity affiliated with DR. CHAVDA.

53.      Based on Affiant's experience and knowledge investigating healthcare fraud and kickback schemes, pharmacies involved in defrauding the DOL-OWCP program may pay illegal kickbacks to medical providers and/or facilities, for prescribing or utilizing their drugs as an

incentive to prescribe a particular drug or not utilize a competitor.  Individuals engaged in fraud

also commonly attempt to conceal illicit kickback payments among co-conspirators by

disguising such kickbacks as marketing, loans, consulting fees, speaking fees or medical studies.

54.     Between on or about April 9, 2016 and on or about December 19, 2016, Eudora

sent the following payments to Medcare:

| Date | From | To | Amount | Memo |
|---|---|---|---|---|
| 4/9/2016 | Eudora Healthcare | Medcare | $ 58,215.91 | Consulting |
| 5/10/2016 | Eudora Healthcare | Medcare | $ 336,662.19 | |
| 6/8/2016 | Eudora Healthcare | Medcare | $ 549,282.15 | |
| 7/6/2016 | Eudora Healthcare | Medcare | $ 601,906.68 | |
| 8/10/2016 | Eudora Healthcare | Medcare | $ 100,465.40 | |
| 9/13/2016 | Eudora Healthcare | Medcare | $ 808,039.16 | |
| 10/11/2016 | Eudora Healthcare | Medcare | $ 498,726.70 | |
| 11/14/2016 | Eudora Healthcare | Medcare | $ 243,238.74 | |
| 11/26/2016 | Eudora Healthcare | Medcare | $ 62,426.81 | Marketing |
| 12/19/2016 | Eudora Healthcare | Medcare | $ 10,624.30 | |

55.     Between on or about April 7, 2016 and  on or about June 30, 2016, JIVANJI

through Medcare sent the following payments to TXBJ:

| Date | From | To | Amount | Memo |
|---|---|---|---|---|
| 4/7/2016 | Medcare | TXBJ | $ 12,000.00 | Initial Fee Return |
| 6/30/2016 | Medcare | TXBJ | $ 535.00 | Employee 2nd qtr lunch |

56.     Between on or about May 15, 2016 and on or about November 30, 2016, JIVANJI

sent the following payments to TXBJ:

| Date | From | To | Amount | Mem |
|---|---|---|---|---|
| 5/15/2016 | Naresh Jivanji | TXBJ | $ 300,000.00 | Loan |
| 7/5/2016 | Naresh Jivanji | TXBJ | $ 300,000.00 | Loan |
| 11/30/2016 | Naresh Jivanji | TXBJ | $ 500,000.00 | Loan |

**Attachment A –Solo Page**

## F.  TIME FRAME OF THE EVIDENCE

57.     Between on or about April 7, 2016 to on or about February 9, 2017,

DR. CHAVDA, according to billing records of the U.S. Postal Service, sent prescriptions to

Compounding Solutions for Compounded drugs and other medications for approximately 28

Postal Service patients.  DOL-OWCP paid approximately $4,459,254.00 on those claims.

## G.  PROBABLE CAUSE TO BELIEVE EVIDENCE IS LOCATED AT THE
## SUBJECT PREMISES

58.     The business registration address of TXBJ, according to records of the Texas

Secretary of State, is the SUBJECT PREMISES.

59.     The SUBJECT PREMIES, according to bank records returned in this

investigation, is the address of TXBJ.

60.     The SUBJECT PREMISES, according to DOL-OWCP enrollment forms, is the

address of TXBJ.

61.     On May 19, 2017, investigators conducted surveillance at the location of the

SUBJECT PREMISES.  Investigators observed a sign affixed to the front entrance of the

SUBJECT PREMISES that reads "Texas Bone & Joint Center."

62.     Affiant believes, based on the information provided to me through interviews in

this case, business and financial records returned during this investigation, knowledge of

recordkeeping requirements of the DOL-OWCP program, and his training and investigative

experience, individuals involved in operating the businesses similar to TXBJ typically keep,

among other information, documents and financial information, including that sought in

Attachment B, at the business's purported business or administrative location.  Affiant similarly

believes, based on the same, that such information is commonly stored and maintained in

**Attachment A –Solo Page**

electronic format, including on computers, servers or both.  Affiant therefore believes that such

information is likely to be maintained at the SUBJECT PREMISES.

### H.  CONCLUSION

63.     Based upon the above information, probable cause exists to believe there has been

a violation of federal laws, including, among other offenses:  conspiracy to commit healthcare

fraud under 18 U.S.C. § 1349; healthcare fraud under 18 U.S.C. § 1347; conspiracy to pay and

receive illegal kickbacks under 18 U.S.C. § 371; and the payment and receipt of illegal kickbacks

under 42 U.S.C. § 1320a-7b(b).

64.     Probable cause further exists to believe that evidence of those violations, among

others, exist and are maintained at the SUBJECT PREMISES.

65.     In consideration of the foregoing, I respectfully request that this Court issue a

search warrant for the SUBJECT PREMISES at 8251 Bedford-Euless Road, Suite 210, North

Richland Hills, Texas 76180 and thereby authorize the search of this location, as described more

fully in Attachment A, and the seizure of items described in Attachment B.


_____
Adam Watson
Special Agent, (USPS-OIG)


Subscribed and sworn to before me on June 5, 2017 at _/ : 5 6_ a.m./p.m. in Fort Worth
Texas.


_____
JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE


**Attachment A –Solo Page**

**ATTACHMENT A**
**DESCRIPTION OF THE SUBJECT PREMISES**

The property at 8251 Bedford-Euless Road, Suite 210, North Richland Hills, Texas 76180 is a

business unit located in a multi-level office complex.  A sign stating "Texas Bone & Joint

Center" is located on the front entrance door and toward the top of the unit.



**Attachment A –Solo Page**

**ATTACHMENT B**
**ITEMS TO BE SEIZED FROM THE SUBJECT PREMISES**

A. For the time period January 1, 2016 through the date of execution of the warrant:

B. Items used by, for, or on behalf of Texas Bone & Joint Center, including:

1. Patient files and related clinical records, patient testing orders and testing reports used or obtained in patient care, appointment notes, procedure notes, physicians' orders, communication notes, assessments, insurance pre-certifications, follow-up/discharge assessments, other patient assessments, medication profiles, consent forms, office compliance reviews, clinical records reviews, clinical licenses and certifications, correspondence, patient progress notes, and patient visit logs/sign-in sheets.

2. Forms, or other claims for, or data submitted in support of, payment by or on behalf of FECA, private insurance, or by a monetary instrument of the patient (such as cash or check).

3. Remittance advices, receipts, and other records showing payments received payment by or on behalf of FECA, private insurance, or by a monetary instrument of the patient.

4. Inquiry replies and memoranda, notes, correspondence, emails, lists, logs, or ledgers commenting upon or reflecting verification of a patients' eligibility or ineligibility for treatment under FECA, or private insurance.

5. Memoranda, notes, correspondence or emails concerning any inspection, review, audit or inquiry from any Federal, State, or local regulatory agency or any private insurance company.

6. Instructions, advice, policies, procedures, directives, manuals, memoranda, notes, and emails relating to coding or billing.

7. Instructions, lists, memoranda, notes, emails, or other documents regarding how to obtain referrals for patients and how to provide referrals for patients; what service(s) to offer or provide; how to schedule patients for services; when and how to verify and bill insurance; and how and why to prepare/structure certifications, procedure notes, or other documentation to obtain payment from government and private healthcare programs.

8. Patient ledgers and other documents reflecting services or medications provided to patients by the referenced company or personnel.

9. Memoranda, notes, correspondence emails, tracking logs, satisfaction questionnaires, and other records relating to any patient complaints or disputes regarding any services or medications, the billing for such services or medications, or payments to patients of the referenced company or personnel.

10. Personnel and payroll files and records, such as employee lists, documents reflecting names, addresses, duration of employment, personnel files, pay schedules, W-2s, 1099s, commissions, duties, and reasons for separation or termination from employment of all present and past officers, employees, and independent contractors of the referenced company or personnel.

11. Payment records, work schedules, time sheets, appointment books, employee notes or summaries, and other records showing the services provided by and all payments made to or for nurses, nurse aids, physicians, physical therapists, and other persons relating to the services or medicines of the referenced company or personnel.

12. Payment records, work schedules, time sheets, appointment books, notes, summaries, correspondence, or other records relating to referral sources or individuals providing marketing, outreach, or "community liaison" services relating to the referenced company or personnel.

13. All contracts or other documents relating to financial agreements relating to the referenced company or personnel.

14. Records identifying the names, addresses, and phone numbers of medical doctors, medical assistants, licensed nurses, nurse aids, and other persons providing health services on behalf of the referenced company or personnel.

15. Physician lists, referral lists, and other records identifying the names, addresses, and phone numbers of persons or entities that have referred patients to the referenced company or personnel.

16. Corporate, financial, and business records for the referenced company or personnel, such as articles of incorporation, resolutions, records regarding officers' duties and responsibilities, licensing records, property records, ownership corporate structure, and records showing control and ownership relating to the referenced company or personnel.

17. Bank and brokerage account monthly statements, opening records, checks, wire transfers, check registers, cancelled checks, deposit tickets, and records of transfer relating to the referenced company or personnel.

**Attachment B –Page 2**

18. Invoices, purchase orders, credit card information, wire transfers, payments, account statements, and investment records relating to the referenced company or personnel.

19. Calendars, appointment books, telephone message pads, day planners, logs, correspondence, rolodexes, personal digital assistants (PDAs), emails, and addresses books relating to the referenced company or personnel.

20. Any correspondence, including transmissions by facsimile, stored e-mail, and text messages exchanged between the referenced company or its personnel.

21. Additionally, all computer equipment and the items listed above that are contained in any computer equipment as follows, and pertain to the above listed persons, business, or entities:

(a)   Computer equipment, including any electronic devices that are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data.  These devices include but are not limited to any data processing hardware (such as central processing units, memory typewriters, and self-contained "laptop", "notebook", or "table" computers); internal and peripheral storage devices (such as laser disks, fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks);

(b)   Information, instructions, programs or program code, stored in the form of electronic, magnetic, optical, or other media which are capable of being interpreted by a computer of its related components, data, data fragments or control characters integral to the operation of computer software, operating system software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended for use to communicate with computer components;

**Attachment B –Page 3**

(c)     Any written, recorded, printed or electronically stored material which explains or illustrates the configuration or use of any seized hardware, software, or related item;

(d)     Devices, programs, or data whether themselves in the nature of hardware of software that can be used or is designed for use to restrict access to or facilitate concealment of any computer hardware, computer software, computer-related documentation, electronic data, records documents, or materials within the scope of this application, any data security hardware (such as any encryption devices, chips, and circuit boards), passwords, data security software of information (such as test keys and encryption codes), and similar information that is required to access computer or data or to otherwise render programs or data into a useable form;

(e)     Any information stored in the form of electronic, magnetic, optical, or other coding on computer media or on media capable of being read by a computer or computer related equipment.  This media includes but is not limited to any fixed disks, external hard disks, removable hard disk cartridges, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, laser disks, or other memory storage devices;

(f)     Any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonograph records, printing, or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact discs), or any information on an electronic or magnetic storage device (such as floppy diskettes, hard disks, CD-ROMs, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks), as well as printouts or readouts from any magnetic storage device;

(g)     Any and all communications previously received or transmitted, or prepared in contemplation of transmission, including electronic mail or data associated with electronic bulletin board systems, stored on any of the electronic media named above.  All electronic communications, including those previously received or transmitted, or held in temporary, intermediate storage incident to transmission, documents, and materials, including those used to facilitate communications, as used above shall include any and all communications previously received, transmitted, or stored, or prepared in contemplation of transmission, including electronic mail or data associated with electronic bulletin board systems, whether stored on any of the

electronic media named above or held in temporary, intermediate storage incident to transmission to the individuals or premises within the scope of this application;

(h)    Any and all electronic information or electronic data, stored in any form, which is used or has been prepared for use either for periodic or random back-up (whether deliberate or inadvertent, or automatically or manually initiated), or any computer or computer system, floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, video cassettes, and other media capable of storing magnetic or optical coding;

(i)    Such electronic data in the form of electronic records, documents, and materials, including those used to facilitate communication;

(j)    "Hidden," erased, compressed, password-protected, or encrypted files;

(k)    "Mainframe" computers, or "micro" or "personal" computers, either standing alone or joined through a series of connected computers called a "network";

(l)    All magnetic storage devices as well as the central processing units ("CPUs") and applicable keyboards and monitors which are an integral part of the processing unit; and

(m)    Various file "directories" and the individual files they contain, recently deleted data; scanning storage areas for deliberately hidden files.

(n)    In order to obtain the above described records, the agents are authorized to seize the computers and/or storage media and make a mirror image of the computers and/or storage media off-site for the purposes of searching.  Upon completion of the off-site imaging, the agents will attempt to return the seized computers and/or storage media.  In addition, if the information described above cannot be read and understood without the software or programs that created those files or records, the agents are authorized to seize such software and any documentation and manuals that describe the software and instruct on its installation and use.